UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY  DIVISION


ROBERT HOYT,                                    )
         Plaintiff,                            )
                                                )
  vs.                                          )
                                                )
MICHAEL LEE BENHAM, SHARON                      )
WELLS BENHAM, JOHN BARKER,                      )
PHYLLIS BARKER, ALL THE                         )
UNKNOWN HEIRS OF HERMAN M.                      )
FESSELL, HERMAN NICHOLAS                        )      4:08-cv-179-RLY-WGH
FESSELL, ALAN TRENT FESSELL,                    )
DENNIS ERIC FESSELL, LINDA D.                   )
FESSELL, C. RYAN EUBANK, BRENDA                 )
L. EUBANK, HOOSIER HILLS CREDIT                 )
UNION, and SAMSON RESOURCES                     )
COMPANY,                                        )
         Defendants.                           )
                                                )
                                                )


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Robert Hoyt ("Plaintiff" or "Mr. Hoyt") owns a forty acre parcel of land

(the "Hoyt 40") in Orange County, Indiana.  He brings these claims in order to establish

access to the Hoyt 40 from Burma Road, which runs generally east-west just south of, but

not contiguous to, the Hoyt 40.  Counts One and Five of the Third Amended Complaint

("Complaint") were dismissed in the court's Summary Judgment Entry of July 23, 2010.

Count Three was dismissed by the Plaintiff at the beginning of the bench trial on this

matter on November 1, 2010.  Counts Two and Four remain.  In Count Two, Plaintiff

claims that a public road, consisting of Road #4 and Road #5, provides access to the Hoyt 40. This road runs north-south and crosses land owned by Defendants Mike and Sharon Benham (the "Benhams"), Defendants John Barker and Phyllis Barker (the "Barkers") (collectively, "Defendants"), and the United States of America. In Count Four, Plaintiff alleges a prescriptive easement was established by his predecessors in interest across the Barkers' land from Burma Road north to the Hoyt 40 along what is labeled as Road #2. The Benhams and the Barkers deny that Road #4 and Road #5 have ever been public roads. In the alternative, if at one point they were public roads, Defendants insist that the roads have since been abandoned. The Barkers also deny the establishment of a prescriptive easement along Road #2. Finally, in their Counterclaim, the Benhams assert a slander of title claim against Mr. Hoyt.

A bench trial commenced in this case on November 1, 2010, and concluded on November 2, 2010. The parties filed their Proposed Findings of Fact and Conclusions of Law on December 23 and 27, 2010. The court now issues its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a):

**FINDINGS OF FACT**

## I.     The Hoyt 40 and Surrounding Property

1.     Mr. Hoyt purchased forty acres, the Hoyt 40, from Bernard Burden ("Mr. Burden") on January 29, 2001. (Stipulation No. 11).

2.     The Hoyt 40's southern boundary is contiguous to the Barkers' forty-acre parcel (the "Barker 40"). (Stipulation No. 15).

3. The Hoyt 40's western boundary is contiguous to the United States Forest Service's ("Forest Service") forty-acre parcel (the "U.S. 40"). (Stipulation No. 16).

4. The Benhams' 11.5 acres ("Benham 11.5") lies north of Burma Road, to the west of the Barker 40 and south of the U.S. 40. The northeast corner of the Benham 11.5 touches the southwest corner of the Hoyt 40. (Transcript Volume I ("Tr. I") at 72).

5. The southern boundary of the Hoyt property does not intersect with Burma Road. (Tr. I at 41).

**II.    Count Two: Road #4 and Road #5 (North-South Public Road)**

**A.    Location of Road #4 and Road #5**

6. Road #4 begins at Burma Road on the Barkers' property and travels northwest for a short distance and then turns north on the United States Forest Service's easement ("Forest Service easement" or ".41-acre strip"), ending at the southwestern corner of the Hoyt 40 and the southern border of the U.S. 40. (Plaintiff's Ex. 34 at 9). Thus, the majority of Road #4 lies along the .41-acre strip. (*See id.*).

7. The Forest Service easement, also known as the .41-acre strip, is a thirty-foot wide strip of land that begins at Burma Road, runs due north approximately 600 feet, and touches the southwestern corner of the Hoyt 40. (Plaintiff's Ex. 34 at 3, 9). The Forest Service easement is located along the easternmost section of the

Benham 11.5.  The Barker 40 lies to the east of the Forest Service easement.  (Tr. I at 69; Plaintiff's Ex. 34).

8.      Because Road #4 meets only the corner of the Hoyt 40, Mr. Hoyt cannot access his property from Road #4 alone.  (Tr. I at 72).

9.      Road #5 begins at the end point of Road #4, tracking northwest and away from the Hoyt 40 for approximately 210 feet, then north for 220 feet parallel to the Hoyt 40, and finally northeast for 230 feet to the western boundary of the Hoyt 40. (Plaintiff's Ex. 34 at 10).

**B.      Condition and Use of Road #4 and Road #5[1]**

**1.      The McBrides (1931-45)**

10.     From their first house, which was located on the Hoyt 40, Irvin McBride ("Irvin") and his family moved to their second house, located three quarters of a mile south on what is now the Benham 11.5.  They lived in the second house from approximately 1931-45.  The second house is labeled the McBride/Fessell homestead in Plaintiff's Exhibits 31(A-C).  (Tr. I at 134; Plaintiff's Exs. 31(A-C)).

11.     To travel from the second house located on the Benham 11.5 to the Hoyt 40, Irvin

_____

[1]No evidence was presented regarding use of Road #5.  The only mention of Road #5 in Plaintiff's Proposed Findings of Fact and Conclusions of Law is Tony Martin's testimony that he saw vehicles parked by the dry creek branch crossing, which appears to be near the junction of Road #4 and Road #5 rather than solely on Road #5, a time or two in the late 1960s or early 1970s (Tr. I 176, 180-81; Plaintiff's Ex. 35A).  Also, Plaintiff's assertion that Mr. Burden testified to putting gravel on Road #5 just north of the end of Road #4 is misleading, because his actual testimony is that he put gravel up to the creek, making it impossible without a diagram to determine whether the gravel actually continued onto Road #5.  (Docket # 173, ¶ 19; Tr. I at 227-29 (B. Burden)).

traveled northeast across the Benham 11.5 along a route that does not follow Road #4, rather than traveling by his grandmother's, Amy Williams', house on what is now the Barker 40.  (Tr. I at 147-48 (I. McBride); Tr. I at 171-72 (A. McBride)).  Plaintiff's Exhibit 31C depicts this route with purple and blue lines.

12.   The McBrides never took a direct north-south route across the Benham 11.5 along Road #4 from the McBride/Fessell homestead to the Hoyt 40.  (Tr. I at 148 (I. McBride)).

13.   Alonzo McBride ("Alonzo"), Irvin's brother, recalled two routes from the second house to the first house.  One route on which Irvin could drive his Model T went north and east from the second house to the first house.  The second route went by Amy Williams' house on what is now the Barker 40 and then turned "mostly north, northwest."  (Tr. I at 164-65, 170 (A. McBride)).

14.   Neither the northeast route nor the route by Amy Williams' house follows Road #4.  (Plaintiff's Ex. 31A (I. McBride's depiction of the route by Amy Williams' house in red with which A. McBride agrees at Tr. I at 166); Plaintiff's Ex. 31B (depicting the northeast route in blue and the route by Amy Williams' house in red, with A. McBride's marks in green); Plaintiff's Ex. 31C (I. McBride's depiction of the northeast route in blue)).

### 2.   The Horseback Riders/Hunters (1960s-1980s)

15.   In the 1960s, Road #4 was approximately six to ten feet wide, or the width of a vehicle.  (Tr. I at 122 (T. Blevins) (road was eight feet wide in the early 1960s);

Tr. I at 182 (T. Martin) (in the late 1960s the road was maybe six feet wide, or whatever the width of a vehicle would be); Tr. I at 191 (D. Padgett) (the road was about ten feet wide in the late 1960s and wide enough for a vehicle)).

16.  Timothy Blevins ("Mr. Blevins") has hunted in the vicinity of the relevant properties all of his life.  (Tr. I at 111-12 (T. Blevins)).

17.  In 1968, Mr. Blevins traveled on Road #4 to what is now the Hoyt property in a vehicle at least one time.  (Tr. I at 114-117 (T. Blevins)).  The road was not good, but passable until four-wheelers cut ruts so deep that a car could not travel that route.  (Tr. I at 120-21 (T. Blevins)).

18.  Tire tracks along Road #4 indicated use by others; however, Mr. Blevins only observed four-wheelers use the road.  (Tr. I at 121, 130 (T. Blevins)).

19.  Herman M. Fessell[2], who owned the Benham 11.5 in the 1960s, saw Mr. Blevins using the road and neither interfered with nor stopped his use.  (Tr. I at 118-19 (T. Blevins)).

20.  Richard Wellman, who hunted on the Benham 11.5 in the mid-1960s and is Defendant Sharon Benham's distant cousin, describes Road #4 at that time as grown up with trees and brush.  He never saw any vehicles on it.  (Tr. II at 508 (R.

_____

[2]Herman M. Fessell is the father of Herman N. Fessell.  (Tr. I at 296; Transcript Volume II ("Tr. II") at 550-51).  In their testimony, witnesses sometimes distinguish between the two men, in which case any related finding or conclusion would distinguish between the two men. Other times, witnesses refer only to "Herman Fessell" or "Mr. Fessell."   In those instances, the court will not speculate as to which Herman Fessell the witness is testifying, and any related finding or conclusion will reference "Herman Fessell."

Wellman)).

21. Steve Wells, Defendant Sharon Benham's uncle, walked the .41-acre strip when he hunted on the Benham 11.5 from the mid-1960s through the 1980s and understood the property to be a foot road. (Tr. II at 513, 517, 519 (S. Wells)). He never drove up the road. (Tr. II at 524 (S. Wells)).

22. Horseback riders used Road #4 from approximately 1962 to 1989. (Tr. I at 116 (T. Blevins from 1962 to 1970s); Tr. I at 179, 184-85 (T. Martin from 1967-68 to mid-1980s); Tr. I at 189 (D. Padgett from mid-1960s)).

23. Tony Martin ("Mr. Martin"), a lifelong resident of the Paoli, Indiana, area, began riding horses with up to twenty-five members of a saddle club along Road #4 a few times a year when the property was owned by the Fessells in the late 1960s. (Tr. I at 176, 179-80 (T. Martin)).

24. From 1970 to the mid-1980s, Mr. Martin rode horses once a month on four paths from the horse camp south to Burma Road, only one of which crosses what is now the Benhams' property. (Tr. I at 184-85 (T. Martin)).

25. Mr. Martin never drove a vehicle on the road, but he saw cars parked near Road #4 north of Burma Road once or twice in the late 1960s and early 1970s. (Tr. I at 180-81, 183, 185 (T. Martin); Plaintiff's Ex. 35(A) (marked with a red "X" and labeled "car")).

26. Herman Fessell did not mind if Mr. Martin and his companions rode on Road #4, but Mr. Martin never asked for Herman Fessell's permission to do so. (Tr. I at

182, 185 (T. Martin)).

27. The gate that was later placed on the path did not stop Mr. Martin from riding on it; however, after the Benhams built their house on the Benham 11.5 in 1989 or 1990, Mr. Martin stopped riding on the property at their request. (Tr. I at 187 (T. Martin)).

28. David Padgett ("Mr. Padgett") is another lifelong resident of Orange County, Indiana, who began riding horses along the Road #4 area in the mid-1960s with ten to twelve people every Sunday on a path through the forest that ended at Burma Road to the east of Herman Fessell's property. (Tr. I at 188-89, 191, 193 (D. Padgett)).

29. Mr. Padgett never met Herman Fessell, but rode horses past his house. (Tr. I at 190 (D. Padgett)).

30. Mr. Padgett observed tire tracks in the mid-1960s along what he described as a road and believed "maybe loggers or people had used it," but he never saw cars on that road. (Tr. I at 191-92, 194).

31. After the Fessells sold the property, a gate was put up, and Mr. Padgett was told that the new owners did not want the horseback riders riding there. (Tr. I at 193-94 (D. Padgett)).

32. Hazel Pluris ("Ms. Pluris") rode horses with the saddle club along Road #4 at least three times, the first time being around 1970. (Tr. I at 199-201 (H. Pluris)).

33. Ms. Pluris describes the road as a "mud road" that was well traveled through the

woods.  (Tr. I at 200).

34. Ms. Pluris never saw a vehicle on the road, but could see ruts where vehicles had been.  (Tr. I at 202-03).

35. Herman Fessell never asked Ms. Pluris or her fellow riders to stop riding on the road.  (Tr. I at 202 (H. Pluris)).

36. Ms. Pluris rode around the gate when it was first erected in the late 1980s, but she and her fellow riders quit using the road when they "learned later that somebody didn't want us to use that . . . . We never rode horses where we were not welcome."  (Tr. I at 203).

37. Linda Lee, another horseback rider, did not ask permission to cross Herman Fessell's land, but she does not think he had a problem with it.  (Tr. II at 372 (L. Lee)).

### 3. Russell Wells, Owner of the Benham 11.5 from 1987-1989

38. Russell Wells, the father of Defendant Sharon Benham, purchased eighty acres from Herman N. Fessell in August of 1987, which included the Benham 11.5.  (Tr. II at 320 (R. Wells)).

39. Russell Wells owned the Benham 11.5 for a year and a half before deeding it to the Benhams.  (Tr. II at 320-21 (R. Wells)).

40. Russell Wells' property was completely fenced in the 1950s while owned by the Fessells, with no gate and no road.  (Tr. II at 343-44 (R. Wells)).

41. The Fessells' fence extended past the .41-acre strip onto the Barker 40, which was

owned by William Bosley at the time, and stopped at the east edge of Road #4. (Tr. II at 350-52 (R. Wells)).

42.    The fence was still in place until the early 1970s.  (Tr. II at 352 (R. Wells)).

43.    Russell Wells testified that the property was logged in 1965 and 1984, with logs brought to Burma Road via the .41-acre strip.  (Tr. II at 345 (R. Wells)).  When the loggers finished logging in 1965, they put the fence back in place.  (Tr. II at 347 (R. Wells)).  Regarding the 1984 logging of his property, which is now the Hoyt 40, Mr. Burden saw no evidence that the loggers brought the logs over Road #4. (Tr. I at 238 (B. Burden)).

44.    While he owned the Benham 11.5, Russell Wells did not observe any members of the public crossing the property or car tracks, but he did see horse tracks.  (Tr. II at 310 (R. Wells)).

45.    In September of 1987, Russell Wells put a gate across Road #4 less than twenty feet from Burma Road where the horses traveled in order to keep people from using the road.  (Tr. II at 324, 326 (R. Wells)).

46.    At the time he installed the gate, Russell Wells believed the gate was on his property; however, the gate is actually on Mr. Barker's property.  (Tr. II at 326-27 (R. Wells); Tr. II at 392 (M. Benham)).

47.    Russell Wells walked, but never drove, on Road #4 while he owned the Benham 11.5.  (Tr. II at 330 (R. Wells)).

### 4. Michael and Sharon Benham, Owners of the Benham 11.5 (1989-present)

48. Michael Benham ("Mr. Benham") has driven a tractor and truck on the .41-acre strip during his ownership of the Benham 11.5, which began in 1989. Around 1990, he recalls four wheelers using the .41-acre strip on three or four occasions. (Tr. II at 395, 398, 406 (M. Benham)).

49. Any use of vehicles on the .41-acre strip by Mr. Benham to bring in building materials was for his own private use. No one else has crossed the Benham 11.5 to bring in building materials while Mr. Benham has owned the property. (Tr. II at 402 (M. Benham)).

50. The Benhams observed horseback riders using the .41-acre strip, but the riders stopped using it at the Benhams' request. (Tr. II at 405 (M. Benham); Tr. II at 425 (S. Benham)).

51. The Benhams use the .41-acre strip as their yard. (Tr. II at 405 (M. Benham); Tr. II at 425 (S. Benham)).

52. Mr. Benham stopped maintaining the .41-acre strip in 2003 at the request of the Forest Service. (Tr. II at 388-89 (M. Benham)).

### 5. Bernard and Janice Burden, Owners of the Hoyt 40 from 1983-2001)

53. Mr. Burden and his wife, Janice, purchased what is now the Hoyt 40 in 1983 from Ivan Clark. (Tr. I at 223 (B. Burden)).

54. From 1983 to 1989, the Burdens accessed the Hoyt 40 and their cabin on that

property by driving a pickup truck from Burma Road along Road #4.  (Tr. I at 209-10 (J. Burden); Tr. I at 223-25, 227 (B. Burden)).

55.     Mr. Burden described the road as "drivable" and estimates it was twelve to fourteen feet wide.  (Tr. I at 226-27).

56.     The road to the campsite is difficult to see from Burma Road, unless you know it is there.  (Tr. I at 221 (J. Burden)).

57.     The Burdens put gravel on the road in 1988, beginning twenty feet north of Burma Road and continuing for approximately 500 feet to the creek.  (Tr. I at 227-29 (B. Burden)).

58.     In 1987, several vehicles, including a flat bed truck, delivered materials for cabin and pond construction to the Burdens on what is now the Hoyt 40 using the same road the Burdens used to access the property (Road #4).  (Tr. I at 213-16 (J. Burden); Plaintiff's Ex. 3; Plaintiff's Ex. 4).

59.     The Burdens never saw any vehicles other than their vehicle or their invitees' vehicles on Road #4; however, tire tracks indicated that other vehicles used the road.  (Tr. I at 221 (J. Burden); Tr. I at 226-27, 230 (B. Burden)).

60.     The Burdens did see horseback riders using Road #4 near their cabin.  (Tr. I at 230 (B. Burden)).

61.     When the Fessells owned the neighboring property, Herman Fessell never told the Burdens they could not use Road #4.  (Tr. I at 217 (J. Burden)).

62.     No one ever told Mr. Burden not to use Road #4.  (Tr. I at 225 (B. Burden)).

63. Janice Burden knew they were crossing private property when traveling on Road #4, but believed that anyone could use it. (Tr. I at 219-20 (J. Burden)).

64. After the cabin was built, Mr. Burden installed a twelve to fourteen foot wide gate with a lock across Road #4, south of his property line on Russell Wells' property, in order to keep people away from the cabin. (Tr. I at 231-33, 248 (B. Burden); Tr. II at 329 (R. Wells); Tr. II at 392 (M. Benham)).

65. Mr. Burden's gate was located where Road #4 turned due north, around 200 feet farther north on Road #4 than Russell Wells' gate. (Tr. II at 329 (R. Wells)).

66. At some point after he installed his gate, Mr. Burden discovered that a new chain and lock had been placed on Russell Wells' gate. (Tr. I at 234 (B. Burden); Tr. II at 329 (R. Wells)).

67. Mr. Burden asked Russell Wells for permission to access the road, but Russell Wells did not give him permission. (Tr. I at 243 (B. Burden); Tr. II at 329-30 (R. Wells)).

68. The Burdens neither used Road #4 to access the Hoyt 40 nor visited the Hoyt 40 from the time Russell Wells denied them permission to use the road in the early 1990s until they sold the property to Mr. Hoyt in 2001. (Tr. I at 247 (B. Burden)).

69. Mr. Burden took no legal action when his access to the route was blocked. (Tr. I at 241 (B. Burden)).

70. Prior to selling the Hoyt 40 to Mr. Hoyt in 2001, Mr. Burden told Mr. Hoyt that "there was a problem accessing the land from Burma Road" and explained the

problem. (quoting Tr. I at 342 (B. Burden); Tr. I at 297-98 (R. Hoyt)). Mr.

Burden had known about the problem for approximately ten years. (Tr. I at 244

(B. Burden)).

### 6. Robert Hoyt, Owner of the Hoyt 40 from 2001-present

71. Prior to filing this lawsuit, Mr. Hoyt asked Mr. Benham whether he could use the

.41-acre strip to access the Hoyt 40, even offering money in exchange for use of

the easement, but Mr. Benham denied Mr. Hoyt permission to use it. (Tr. II at 406

(M. Benham)).

72. Mr. Hoyt has walked Road #4. (Tr. I at 252 (R. Hoyt)).

73. Pictures taken by Mr. Hoyt in 2001 show Road #4 to be clear at Burma Road;

however, the road becomes overgrown with brush and branches as it progresses

north along the Forest Service easement. (Tr. I at 253-55 (R. Hoyt); Plaintiff's Ex.

2).

74. According to a 1997 official trail map for the Hoosier National Forest, a brown

trail marked "638" tracks Road #4; however, the map legend notes that "[b]rown

roads or trails appearing on this map are private or unmaintained and are not open

to use by horses, bicycles, or vehicles." (Tr. I at 269-70, 274-75 (R. Hoyt);

Plaintiff's Ex. 40).

75. The Forest Service informed Mr. Hoyt in 2003 that while members of the public

could walk on the .41-acre strip, they could not ride a horse or drive a car on it.

(Tr. II at 559-61 (R. Hoyt)).

76. In a letter to Mr. Hoyt dated March 10, 2003, Kenneth Day of the Forest Service informed Mr. Hoyt that "[t]he use of an easement . . . for the sole purpose of accessing private land is not an appropriate use and is out of the scope of our rights to the easement." (Tr. II at 588 (R. Hoyt); Benham Ex. B).

77. Mr. Hoyt has not used Road #4 for a twenty year period. (Tr. I at 276 (R. Hoyt)).

### 7. Jim Oakley, Land Surveyor

78. According to Jim Oakley, a licensed land surveyor, Road #4 is grass-covered, but is mowed closely and maintained at Burma Road; however, as it progresses north along the Forest Service easement, the road enters a woods, becomes overgrown, and narrows to twelve to fifteen feet wide. (Tr. I at 43; 70 (J. Oakley)).

79. Mr. Oakley discovered evidence of an old road bed and sparse areas of gravel along the narrow stretch of road, but believes Road #4 has "not been traveled by vehicles in a while." (Tr. I at 24, 43; 44, 67 (J. Oakley)).

80. According to Mr. Oakley, the vegetation growing in Road #4 indicates that, as of late 2010, Road #4 has not been used by anyone for "probably seven to ten years . . . guessing by the size of the small trees there." (Tr. I at 71).

81. To travel Road #4 with a vehicle today, the road would need to be surfaced with gravel or pavement and the brush and trees cleared. (Tr. I at 67 (J. Oakley)).

82. Road #4 is not what Mr. Oakley would consider a road today. (Tr. I at 73; 75).

### III. Count Four: Road #2 (Prescriptive Easement)

83. Road #2 runs north from Burma Road across the Barker 40 to the Hoyt 40.

(Plaintiff's Ex. 34 at 7).

84.   According to Mr. Oakley, Road #2 is ten to twelve feet wide and contains ruts approximately six feet apart, indicating it was traveled at some point by some type of vehicle. (Tr. I at 41).

85.   From ages two to eight (approximately 1925-1931), Irvin lived in the first house, also referred to as the house that burned, on what is now the Hoyt 40.  (Tr. I at 132, 134, 140 (I. McBride)).

86.   Irvin traveled from the house that burned to Amy Williams' house, located on what is now the Barker 40, mostly by foot but occasionally by wagon on a path that does not follow Road #2.  (Tr. I at 136 (I. McBride); Plaintiff's Ex. 31A (red path drawn by I. McBride)).  Instead, Irvin's path appears to align with Road #6, although nothing in Irvin's or Alonzo's testimony explicitly refers to Road #6. (Plaintiff's Ex. 31A; Plaintiff's Ex. 34 at 7, 11).

87.   No claim for a prescriptive easement across Road #6 is made in the Complaint, and Exhibit A to the Complaint, which depicts the roads relevant to the Complaint, does not include Road #6.  (Tr. I at 81-82 (J. Oakley); Complaint, Ex. A).

88.   Although he never witnessed a family member ask her for permission to use the road, Amy Williams knew Irvin's family traveled Road #6 and never objected. Irvin used the road with her permission, and "[t]here was never anything said different."  (Tr. I at 139, 152, 157 (I. McBride)).

89.   Alonzo does not remember Irvin ever taking the route by Amy Williams' house

(Road #6) to travel from their second house, located on the Benham 11.5, to the Hoyt 40, and Irvin did not take the Model T on that route. (Tr. I at 171-72).

90. Irvin and Alonzo never saw anyone from the public travel the route from Amy Williams' house to the house that burned (Road #6). (Tr. I at 151 (I. McBride); Tr. I at 175 (A. McBride)).

91. William Bosley, whose family owned the Barker 40 from 1960-1998, does not remember anyone making a claim for use to travel on Road #2 in order to access the Hoyt 40. (Tr. II at 542-43 (W. Bosley)).

92. Regarding routes from Burma Road across the Barker 40 to the Hoyt 40, Mr. Burden observed that "just east of the creek, there was what appeared to be an old logging road, but it was so grown up [he] never walked it." (Tr. I at 237 (B.Burden)).

93. Mr. Hoyt asked John Barker ("Mr. Barker"), the current owner of the Barker 40, for an easement across the Barker 40 to the Hoyt 40, but Mr. Barker said no. Mr. Barker did not want to be involved in an easement due to problems with an easement on previously owned property. (Tr. II at 441-42 (J. Barker)).

94. When he purchased the Barker 40, Mr. Barker attributed any noticeable tracks on the property to logging. (Tr. II at 443 (J. Barker)).

95. Mr. Barker did not know of any prescriptive easement claims with regard to Road #2 until Mr. Hoyt filed that claim in 2007. (Tr. II at 445 (J. Barker)).

96. During his research of the titles and deeds for the Barker 40 dating back to 1900,

Mr. Barker never discovered any claim of a prescriptive easement across the Barker 40. (Tr. II at 450 (J. Barker)).

97. Mr. Hoyt has walked on Road #2 from Burma Road to the Hoyt 40 in the past, but has not done so since Mr. Barker told Mr. Hoyt absolutely not to set foot on his property. (Tr. I at 305 (R. Hoyt)).

98. Today, Road #2 is mostly an overgrown, wooded area with small brush growing in the road. (Tr. I at 76:12-20).

99. According to Mr. Oakley, Road #2 was never an official road. (Tr. I at 77:17-24).

## IV. Slander of Title Counterclaim: Property Transfers and Ownership

100. Russell Wells believed he owned the .41-acre strip while he owned the Benham 11.5, because he believed it was included in the original deed of the property from Herman N. Fessell that was recorded on August 26, 1987. (Tr. II at 330-31, 343; Joint Ex. 8).

101. A corrective warranty deed recorded on April 28, 1989, conveys eighty acres, including the Benham 11.5 but excepting the .41-acre strip, to Russell and Virginia Wells from Herman N. Fessell. (Tr. I at 307-08 (R. Hoyt); Joint Ex. 9).

102. Russell Wells was not aware that the corrective warranty deed listed the easement as excepted. (Tr. II at 331 (R. Wells); Joint Ex. 9).

103. Russell Wells intended to transfer all his interest in the Benham 11.5 to Mike and Sharon Benham in 1989. (Tr. II at 348-49 (R. Wells)).

104. Ralph Miller, a representative of the U.S. Forest Service, told Russell Wells in

1987 that he owned the .41-acre strip, and that the U.S. Forest Service had a right of passage on it.  (Tr. II at 334-35 (R. Wells)).

105.   Recorded on May 22, 1989, the deed from Russell and Virginia Wells to the Benhams of the Benham 11.5 describes the property conveyed as "[b]eginning on the east line of a 30 foot driveway . . . that is 30 feet west of the northeast corner . . . ."  (Tr. II at 333-34 (R. Wells); Joint Ex. 10).  The east line of the 30 foot driveway refers to the east line of the .41-acre strip, which meets the northeast corner and thus could not be 30 feet west of the northeast corner; therefore, the deed created an ambiguity as to whether the Benham 11.5 begins on the west line or the east line of the .41-acre strip.  (Tr. II at 390 (M. Benham); Tr. II at 554 (R. Hoyt); *see* Plaintiff's Ex. 34 at 9).

106.   After Russell Wells deeded the Benham 11.5 to the Benhams, Tom Krueger of the U.S. Forest Service told Russell Wells that he still owned the .41-acre strip and did not convey it to the Benhams.  (Tr. II at 335-36 (R. Wells)).

107.   On October 19, 2009, after this lawsuit began, Russell Wells signed a corrective deed clarifying the ambiguity of the legal description in the original deed and conveying any interest he had in the .41-acre strip to the Benhams.  (Tr. II at 336-37; Joint Ex. 24).  The corrective deed was intended to clarify that the Benham 11.5 began on the east line of the .41-acre strip.  (Tr. II at 390-91 (M. Benham)).

108.   Prior to filing this lawsuit in 2001, Mr. Hoyt asked Mr. Benham for an easement across the .41-acre strip, even offering money for it, but Mr. Benham refused.  At

that time, Mr. Hoyt knew the Benhams were claiming they owned the .41-acre strip, and he treated them like the owners of the property. (Tr. I at 278-79 (R. Hoyt); Tr. II at 406 (M. Benham); Tr. II at 580 (R. Hoyt)).

109. Prior to filing this lawsuit, Mr. Hoyt investigated the deeds for the Benham 11.5, beginning in 1954 and ending with the Benhams. (Tr. I at 279-80 (R. Hoyt); Joint Exs. 1, 5, 8-10).

110. Mr. Hoyt filed a Motion to Establish Easement across the .41-acre strip that led to this lawsuit on November 26, 2001, and, as advised by his lawyer, did not name the Benhams in the initial pleading, because he and his attorney did not believe the Benhams owned the .41-acre strip. (Tr. I at 277-78, 289 (R. Hoyt); Benham Ex. D). Mr. Hoyt and his attorney believed that Herman N. Fessell never conveyed the .41-acre strip to Russell Wells. (Tr. I at 288 (R. Hoyt)).

111. Neither Russell Wells nor the Benhams were named in Mr. Hoyt's Motion to Establish Easement and received no notice of the action. (Tr. II at 348 (R. Wells); Tr. II at 408 (M. Benham); Benham Ex. D).

112. According to Mr. Hoyt and Mr. Oakley, the Auditor's records and plat books show that the Forest Service owns the .41-acre strip. (Tr. I at 64-65 (J. Oakley); Tr. II at 556-59 (R. Hoyt)).

113. Despite the Auditor's records, Mr. Hoyt did not name the United States in his Motion to Establish Easement, because "[he] talked to them, and they claimed they did not own it." (Tr. II at 584 (R. Hoyt); Benham Ex. D).

114. In February of 2003, Mr. Hoyt told Mr. Benham that he thought Mr. Benham was not the owner of the .41-acre strip, because Mr. Benham did not pay taxes on that property. (Tr. II at 401, 406 (M. Benham)).

115. Jean Kelly, a government employee at the county courthouse, told Sharon Benham that the government was paying taxes on the .41-acre strip, which was exempt from taxes; however, the deed showed that the Benhams owned the property. Thus, the tax records and the deed were inconsistent. (Tr. II at 421-23 (S. Benham)).

116. In his Amended Complaint to Establish Easement filed on March 24, 2006, Plaintiff named the Benhams as the owners of the .41-acre strip. (Tr. I at 289-91 (R. Hoyt); Joint Ex. 12 at ¶ 2).

117. While researching deeds, Mr. Hoyt discovered a deed from the Fessells to the Owenses conveying what is now the U.S. 40, which Mr. Hoyt believed to convey fee simple ownership of the U.S. 40 and the .41-acre strip to the Owenses. (Tr. II at 549-50 (R. Hoyt)).

118. The Owenses later deeded the U.S. 40 and an easement across the .41-acre strip to the United States. (Joint Ex. 4).

119. Mr. Hoyt believes that the deed from the Owenses to the United States indicates that the Owenses did in fact retain ownership of the .41-acre strip, but he does not believe the Owenses intended to retain ownership of the strip. (Tr. II at 581 (R. Hoyt)).

120.    In another deed, Herman M. Fessell conveyed eighty acres that includes the

Benham 11.5 to Herman N. Fessell; however, the deed lists the .41-acre strip as

excepted from the transfer.  (Tr. II at 550-51 (R. Hoyt); Joint Ex. 5).  Based on this

deed and the Fessell/Owens deed, Mr. Hoyt believed that Herman M. Fessell

conveyed the .41-acre strip to the Owenses, not Herman N. Fessell.  (Tr. II at 552

(R. Hoyt)).

121.    Mr. Hoyt then discovered the corrective deed in which Herman N. Fessell

conveyed eighty acres that included the Benham 11.5 to the Wells but excepted the

.41-acre strip, as well as the ambiguous deed from the Wells to the Benhams.  (Tr.

II at 553 (R. Hoyt); Joint Exs. 9-10).

122.    Mr. Hoyt's attorney, with Mr. Hoyt's approval, sent Herman N. Fessell, heir of

Herman M. Fessell, a letter asking him to sign a quitclaim deed.  Herman N.

Fessell did not sign the quitclaim deed.  (Tr. I at 296 (R. Hoyt)).

123.    On February 26, 2007, Norman E. Owen ("Mr. Owen"), the sole heir of the

Owenses, signed two quitclaim deeds.  (Tr. I at 292, 294 (R. Hoyt); Benham Exs.

E-F).  In the quitclaim deed recorded on April 11, 2007, Mr. Owen released and

quit-claimed to Mr. Hoyt a non-exclusive easement across the .41-acre strip.

(Benham Ex. E).  In the other quitclaim deed recorded on May 25, 2007, Mr.

Owen released and quit-claimed to Mr. Hoyt a fee simple interest in the .41-acre

strip.  (Tr. I at 293; Benham Ex. F).

124.    Mr. Hoyt knew these deeds would be recorded when he obtained them.  (Tr. I at

292-93).

125. By filing the quitclaim deeds, Mr. Benham believed Mr. Hoyt to be making a statement concerning his ownership of the .41-acre strip. (Tr. II at 408-09 (M. Benham)).

126. Between 2001 and the time he filed the quitclaim deeds in 2007, Mr. Hoyt knew that the Benhams claimed they owned the .41-acre strip. (Tr. II at 580 (R. Hoyt)).

127. In an application for transportation and utility systems and facilities on federal lands signed by Mr. Hoyt on May 31, 2007, Mr. Hoyt attached the quitclaim deed for fee simple ownership of the .41-acre strip, claiming to be the owner of the strip. (Tr. I at 309 (R. Hoyt); Plaintiff's Ex. 8).

128. In his Second Amended Complaint regarding this lawsuit, filed in Orange County Circuit Court on April 18, 2008, Mr. Hoyt claims to be the owner in fee simple of the .41-acre strip. (Tr. I at 281-82 (R. Hoyt); Joint Ex. 13).

129. Mr. Hoyt relied on his own knowledge and experience, as well as his attorneys, in interpreting the deeds in the chain of title for the Benham 11.5. (Tr. II at 578 (R. Hoyt)).

130. Mr. Benham has incurred approximately $18,400.00 in attorneys' fees and costs in defending against this lawsuit. (Tr. II at 411, 413 (M. Benham)).

# CONCLUSIONS OF LAW

131. To the extent any of the foregoing findings of fact is a conclusion of law, it is hereby adopted as a conclusion of law. To the extent any of the conclusions of law set forth below is a finding of fact, it is hereby adopted as a finding of fact.

132. The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1367(c)(3), which allows a district court to retain supplemental jurisdiction over state law claims even after it has dismissed all claims over which it has original jurisdiction.

133. The remaining claims are brought under Indiana law regarding property located in Indiana.

## I. Count Two: Road #4 and Road #5 (North-South Public Road)

### A. Indiana Law on a Public Road by User and Abandonment

134. Under Indiana Code § 8-20-1-15 prior to 1988, all county highways previously laid out according to law, or used as such for twenty years or more, "shall continue as originally located and as of their original width, respectively, until changed according to law." *Chaja v. Smith*, 755 N.E.2d 611, 614 (Ind. Ct. App. 2001) (citing *Zakutansky v. Kanzler*, 634 N.E.2d 75, 82 (Ind. Ct. App. 1994)). Although that language was removed from the statute in 1988, the court may determine that the public accepted a highway by usage if the highway was used as a public highway for twenty years prior to 1988. *Id.*

24

135.    For a public highway to be established by use, the general public must be shown to have used a strip of land as a highway under a claim of right for a period of twenty years. *Smolek v. Bd. of Cnty. Comm'rs of Pulaski Cnty.*, 386 N.E.2d 997, 999 (Ind. Ct. App. 1979) (citing *Columbia Realty Corp. v. Harrelson*, 293 N.E.2d 804, 809 (Ind. Ct. App. 1973)).

136.    Use is the sole test under Indiana Code § 8-20-1-15, "'though frequency of use or the number of users is unimportant.'" *Jackson v. Bd. of Comm'rs of the Cnty. of Monroe*, 916 N.E.2d 696, 703 (Ind. Ct. App. 2009) (quoting *AmRhein v. Eden*, 779 N.E.2d 1197, 1207 (Ind. Ct. App. 2002)), *transfer denied*, 929 N.E.2d 793.

137.    "Public use means the road is 'free and common to all who have occasion to use it as a public highway,' not just certain members of the public who have received permission to use it." *Id.*

138.    "A road does not become a public road simply because the owner selectively permits a few members of the public to use it." *Jackson*, 916 N.E.2d at 703 (citing Ind. Code § 9-13-2-49).

139.    "The public's right to use a public highway established by public use may be lost by abandonment." *AmRhein*, 779 N.E.2d at 1207 (citing *Fenley Farms, Inc. v. Clark*, 404 N.E.2d 1164, 1167 (Ind. Ct. App. 1980)).

140.    "Public use is the sole test in determining whether a highway has been abandoned." *Id.* at 1170.

141.    The law that defines the character of use necessary to establish a public highway

under Indiana Code § 8-20-1-15 also defines the character of use necessary to negate a claim of abandonment. *Fenley Farms, Inc.*, 404 N.E.2d at 1169.

142.  Abandonment will not be presumed if the result would cut off the egress and ingress of landowners. *Id.* at 1170. However, nonuse for thirty-six years justifies a presumption of abandonment. *The Jeffersonville, Madison, and Indianapolis Railroad Co. v. O'Connor*, 1871 WL 5192, at *1 (Ind. 1871).

143.  Where use continues despite an attempted obstruction, a public highway is not abandoned. *Id.* at 1170.

**B.      Use of Road #4 and Road #5**

144.  The general public did not use Road #4 or Road #5 as a highway under a claim of right for a period of twenty years prior to 1988; therefore, Road #4 and Road #5 are not public roads by user.

145.  During the time they lived on the Hoyt 40 and Benham 11.5 from approximately 1925-45, the McBrides never used Road #4 or Road #5 to travel from the Benham 11.5 or the Barker 40 to the Hoyt 40. (*See supra* ¶¶ 10-13, 85; Plaintiff's Ex. 31A-C).

146.  Herman Fessell permitted and/or did not object to the horseback riders' and hunters' use of Road #4, which suggests that the use was not under a claim of right. (*See supra* ¶¶ 19, 26, 35, 37).

147.  Furthermore, Ms. Pluris' testimony that they quit riding on Road #4 at the property owner's request, because they "never rode horses where [they] were not

26

welcome," indicates that the horseback riders were using Road #4 with the consent of the property owner, rather than under a claim of right. (*See supra* ¶ 36).

148. Mr. Martin and Mr. Padgett also testified that they ceased riding on Road #4 at the property owner's request, again indicating that their use was not under a claim of right. (*See supra* ¶¶ 27, 31).

149. Mr. Blevins' testimony is inconsistent regarding his use of a vehicle on Road #4. He initially states that he traveled Road #4 by vehicle several times, then testifies that he drove on Road #4 one time in 1968, and finishes with testimony that he drove it several times. (Tr. I at 115-16, 120-21). Accordingly, his testimony is not credible.

150. While Russell Wells testified that he was aware of loggers using Road #4 in 1965 and 1984 (*see supra* ¶ 43), these events were isolated and occurred nearly twenty years apart. Furthermore, no evidence was presented to show that their use was under a claim of right rather than by permission of the landowner. Additionally, Mr. Burden testified that at the time of the logging of his property in 1984, he saw no evidence that the loggers used Road #4 (*see supra* ¶ 43); therefore, the evidence does not establish that the loggers used Road #4 each time, but even if they did, does not establish that the use was under a claim of right rather than by the request of the landowner.

151. Although Mr. Benham saw four wheelers used on Road #4 a few times in 1990, other witnesses (other than Mr. Blevins during his unconvincing testimony),

including Mr. Wellman, Mr. Martin, Mr. Padgett, and Ms. Pluris never saw vehicles used on Road #4. (*See supra* ¶¶ 20, 25, 30, 34, 48).

152. Mr. Benham has only used a vehicle other than a tractor or four wheeler on Road #4 to bring building materials for his cabin onto the Benham 11.5, which is private use of his own property. (*See supra* ¶ 49).

153. Similarly, the Burdens only allowed their vehicles and their invitees' vehicles on Road #4 from the time they purchased the land in 1983 until Russell Wells blocked their use of Road #4 with a gate and denied them permission to use the road in the early 1990s. (*See supra* ¶¶ 53, 57-58, 66).

154. Even if the Burdens' and their invitees' use of Road #4 was public, such public use only began when the Burdens purchased the Hoyt 40 in 1983. (*See supra* ¶¶ 52-53). Therefore, the Burdens' use accounts for only five years of use prior to 1988 rather than the twenty years necessary to establish a public road by user.

155. There is no evidence that the public used Roads #4 and #5 for twenty years prior to 1988. The McBrides never used Roads #4 and #5 to access the Hoyt 40. From the 1960s through 1988, the roads have been used by the owners of the property and others permitted to use the roads by the owners, such as the horseback riders and hunters. Members of the public used the roads as permitted by the owners, not under a claim of right. Therefore, the court finds that Road #4 and Road #5 are not public roads by user.

### C. Abandonment of Road #4 and Road #5

156. There is no evidence of anything other than pedestrian use of Road #4 or Road #5 by anyone other than the landowner or the landowner's invitees since 1990.

157. Even though the horseback riders continued to ride along Road #4 after Mr. Burden and Mr. Wells placed gates across the road, the obstruction of the road by the gates did prevent vehicles from traveling on Road #4. (*See supra* ¶¶ 36, 45, 63-64). Also, the horseback riders testified that they quit using Road #4 once the Benhams purchased the property in 1989. (*See supra* ¶¶ 27, 31, 36).

158. After the gates were erected and Russell Wells denied Mr. Burden permission to use the road during his ownership of the Benham 11.5 (1987-89), Mr. Burden never drove a vehicle on Road #4. (*See supra* ¶ 67).

159. Also, the Forest Service declared the road private and closed to horse and vehicular travel in 1997, and informed Mr. Hoyt in 2003 that he could not drive or ride horses on Road #4. (*See supra* ¶¶ 73-75; *see also* Plaintiff's Ex. 40, Benham Ex. B).

160. Mr. Hoyt claims to have walked on Road #4 (Tr. I at 252), but never claims to have driven on it. Additionally, Mr. Hoyt was not walking on the easement under a claim of right, but rather with what he understood was the permission of the Forest Service to walk on their easement. (*See supra* ¶ 75).

161. No evidence was presented regarding the use of Road #5 after 1988.

162. Declaring Roads #4 and #5 as abandoned would not definitively cut off egress and

ingress of Mr. Hoyt to the Hoyt 40.  Mr. Hoyt did not include Linda Lee, the

property owner to the north of the Hoyt 40, in this lawsuit, despite the fact that he

may have an easement of necessity claim against her.  (*See* Docket # 130 at 8).

163. Additionally, it is important to note that Mr. Hoyt purchased the Hoyt 40 with

knowledge of the problems with access.  (*See supra* ¶ 70).

164. Accordingly, the court finds that Roads #4 and #5 have been abandoned by

vehicles for at least twenty years.

165. Therefore, even if Road #4 and Road #5 had been used by the public for twenty

years or more prior to 1988, making them public roads by user, the public's right

to use the roads has been lost by abandonment.

## II.    Count Four: Road #2 (Prescriptive Easement)

### A.    Indiana Law on Prescriptive Easements

166. Generally, prescriptive easements "'are not favored in the law,'" and stringent

requirements must be met by the claiming party.  *Wilfong v. Cessna Corp.*, 838

N.E.2d 403, 405 (Ind. 2005) (quoting *Carnahan v. Moriah Prop. Owners Ass'n.,*

*Inc.*, 716 N.E.2d 437, 441 (Ind. 1999)).

167. To establish a prescriptive easement, a party must show "'actual, hostile, open,

notorious, continuous, uninterrupted adverse use for twenty years under a claim of

right.'" *Id.* (quoting *Carnahan v. Moriah Prop. Owners Ass'n., Inc.*, 716 N.E.2d

437, 441 (Ind. 1999)).

168. Similar to the doctrine of adverse possession, a party claiming a prescriptive

easement must provide clear and convincing evidence of each of the following elements: (1) control, (2) intent, (3) notice, and (4) duration. *Id.* (citing *Fraley v. Minger*, 829 N.E.2d 476, 486 (Ind. 2005)).

169. First, to establish control, "[t]he claimant must exercise a degree of use and control over the parcel that is normal and customary considering the characteristics of the land." *Id.* at 406 n.1 (quoting *Fraley v. Minger*, 829 N.E.2d 476, 486 (Ind. 2005)).

170. To satisfy the second element, "[t]he claimant must demonstrate intent to claim full ownership of the tract superior to the rights of all others, particularly the legal owner." *Id.*

171. Third, "[t]he claimant's actions with respect to the land must be sufficient to give actual or constructive notice to the legal owner of the claimant's intent and exclusive control." *Id.*

172. Finally, the claimant must satisfy each element continuously for the required period of time, which for a prescriptive easement is twenty years. *Id.*

### B. Prescriptive Easement and Road #2

173. The only evidence presented with regard to travel on Road #2 was Mr. Oakley's testimony that Road #2 contains ruts approximately six feet apart, indicating it was traveled at some point by some type of vehicle. (*See supra* ¶ 84).

174. Mr. Oakley's testimony neither indicates by whom Road #2 was traveled nor establishes any of the four elements necessary to prove a prescriptive easement on Road #2.

175. Mr. Hoyt claims that he walked Road #2 prior to Mr. Barker's request that Mr. Hoyt not set foot on his property, but this use clearly does not establish the elements of control, intent, and notice. Also, because Mr. Hoyt has only owned the Hoyt 40 since 2001 and this trial concluded in 2010, his use clearly did not continue uninterrupted for twenty years. (*See supra* ¶¶ 69, 97).

176. Finally, although Mr. Hoyt expected the McBride brothers' testimony to establish a prescriptive easement over Road #2, their testimony actually reflects travel on Road #6. ( *See supra* ¶¶ 86-87; Plaintiff's Exs. 31A, 34 at 7, 11).

177. Mr. Hoyt admits in his Proposed Findings of Fact and Conclusions of Law that although Count Four of the Complaint claims a prescriptive easement over Road #2, the McBrides' testimony regarding location of the road they used to access the Hoyt 40 more closely matches Road #6. (*See* Plaintiff's Proposed Findings of Fact and Conclusions of Law (Docket # 173, 59 n.5).

178. Mr. Hoyt's Motion to Amend Count 4 of Plaintiff's Third Amended Complaint to Conform with the Evidence (Docket # 174), which was filed more than three months after the parties submitted their proposed findings of fact and conclusions of law and five months after the conclusion of the bench trial, was denied as untimely (Docket # 177).[3]

_____

[3]Even if the court had granted Mr. Hoyt's Motion to Amend Count 4, the elements of a prescriptive easement were not satisfied for Road #6. The evidence only establishes that the McBrides used Road #6 when traveling from their first house to Amy Williams' house from 1925-31. (*See supra* ¶¶ 85-86). The McBrides did not use Road #6 after moving to the second house in 1931. (*See supra* ¶ 89). Therefore, the evidence does not prove use of Road #6 for

179. Because he has not proven the necessary elements to establish a prescriptive easement over Road #2 through his use or his predecessors-in-title's use, Mr. Hoyt has not proven that he holds a prescriptive easement over Road #2.

## III. Slander of Title

### A. Indiana Law on Slander of Title

180. To prevail on a claim of slander of title, the claimant must prove (1) that the opposing party made false statements regarding the claimant's ownership of the land in question, (2) that those statements were made with malice, (3) and that the claimant sustained pecuniary loss as a necessary and proximate consequence of the slanderous statements. *Freiburger v. Fry*, 439 N.E.2d 169, 173 (Ind. Ct. App. 1982) (citing *Harper v. Goodin*, 409 N.E.2d 1129, 1134 (Ind. Ct. App. 1980)).

181. "Malice is defined as statements made knowingly or with reckless disregard." *Freiburger*, 439 N.E.2d at 174 (citing *New York Times v. Sullivan*, 376 U.S. 254 (1964)).

182. In some cases, attorney fees have been considered a proper measure of damages in slander of title actions. *Wilcox Lumber Co., Inc. v. The Andersons, Inc.*, 848 N.E.2d 1169, 1171 n.1 (Ind. Ct. App. 2006) (citing *Keilbach v. McCullough*, 669 N.E.2d 1052, 1054 n.2 (Ind. Ct. App. 1996)).

---

twenty years by Mr. Hoyt's predecessors, leaving the duration element unsatisfied. Furthermore, the evidence fails to demonstrate an intent by the McBrides to claim full ownership of Road #6 or that the use was adverse to the landowner, Amy Williams, who was their grandmother. (*See supra* ¶ 88).

183. The defense of advice of counsel is applicable to slander of title suits. *Harper v. Goodin*, 409 N.E.2d 1129, 1134 (Ind. Ct. App. 1980).

184. "[T]he mere fact that a party procures and acts upon the advice of an attorney so obtained does not, of itself, exempt him from liability or afford absolute justification for the prosecution. It is merely competent evidence tending to rebut malice and want of probable cause." *Id.*

185. To afford any protection, advice of counsel must be based upon a "full and true statement of all the facts within the knowledge of the person seeking the advice, and must be acted upon in good faith for an honest purpose." *Id.*

**B. The Benhams' Counterclaim of Slander of Title to the .41-acre Strip**

**1. False Statements**

186. The first element of a slander of title claim is satisfied, because Mr. Hoyt made false statements regarding the Benhams' ownership of the .41-acre strip.

187. Mr. Hoyt told Mr. Benham that he did not believe Mr. Benham owned the .41-acre strip. (*See supra* ¶ 114).

188. By recording the quitclaim deeds from Mr. Owen, Mr. Benham was asserting his ownership of the .41-acre strip. (*See* Benham Exs. E-F).

189. Mr. Hoyt also claimed to be the owner of the .41-acre strip in an application for transportation and utility systems and facilities on federal land. (*See supra* ¶ 127; *see also* Plaintiff's Ex. 8).

190. Finally, Mr. Hoyt claimed to be the owner of the .41-acre strip in both his second

and third amended complaints in this proceeding.  (*See supra* ¶ 128; *see also* Joint Ex. 13, Complaint ¶ 8).

191.  In the entry on summary judgment, this court determined that the quitclaim deeds are invalid and Mr. Hoyt has no interest in the .41-acre strip.  (*See* Docket # 130 at 6).

192.  Mr. Hoyt claimed to be the owner of the .41-acre strip in his application to the federal government, in complaints filed with this court, and by recording the quitclaim deeds from Mr. Owen, but this court later determined that Mr. Hoyt has no interest in the .41-acre strip; therefore, Mr. Hoyt made false statements by stating that he, not the Benhams, owned the .41-acre strip.

### 2.  Malice

193.  Ambiguity in the deeds that refer to the .41-acre strip; the filing of a corrective deed to clarify ambiguities subsequent to statements of ownership made by Mr. Hoyt; conflicting information regarding ownership provided by the Forest Service, the Auditor's records, and the Benhams; as well as Mr. Hoyt's defense that he was acting upon the advice of counsel, all tend to rebut the contention that Mr. Hoyt made false statements *with malice* about the Benhams' lack of ownership of the .41-acre strip.

194.  First, the original 1989 deed from the Wells to the Benhams does not unambiguously convey the .41-acre strip to the Benhams, because the description of the land is not clear regarding whether the .41-acre strip is included in the

conveyance. (*See supra* ¶ 105; *see also* Plaintiff's Ex. 34 at 9). Therefore, the deed does not make clear whether the Benhams own the .41-acre strip.

195. Furthermore, to clarify the ambiguity of the legal description in the original deed and conveying any interest he had in the .41-acre strip to the Benhams, a corrective deed from the Wells to the Benhams was recorded in 2009, after Mr. Hoyt's 2007 federal land use application, the filing of Mr. Hoyt's Second Amended Complaint, and the filing of the quitclaim deeds, in all of which Mr. Hoyt claims to be the owner of the .41-acre strip. (*See supra* ¶¶ 105, 107, 123, 127-28).

196. Other deeds also created ambiguities regarding the ownership of the .41-acre strip. The deed from Herman M. Fessell to Herman N. Fessell conveys the Benham 11.5, but excepts the .41-acre strip. (*See supra* ¶ 120). Similarly, the corrective deed from Herman N. Fessell to the Wells conveys the Benham 11.5, but excepts the .41-acre strip. (*See supra* ¶ 101, 121). Additionally, Mr. Hoyt believed that a deed from the Fessells to the Owenses conveyed a fee simple interest in the .41-acre strip, and that a subsequent deed of the same land from the Owenses to the United States only granted an easement over the strip, indicating that the Owenses retained ownership of the strip. (*See supra* ¶¶ 117-19).

197. Mr. Hoyt studied all of these deeds prior to filing this lawsuit. (*See supra* ¶¶ 109, 117-119).

198. Also prior to filing this lawsuit, Mr. Hoyt knew that the Auditor's records showed that the Forest Service owned the .41-acre strip; however, he also was aware that

the Forest Service denied ownership and the Benhams claimed ownership, creating confusion as to the true owner. (*See supra* ¶¶ 108, 112-13).

199. Finally, in this lawsuit and in his pursuit of the quitclaim deeds, Mr. Hoyt was acting upon the advice of his counsel, further rebutting the allegation that he acted with malice. (*See supra* ¶¶ 110, 122, 129).

200. Due to the confusion surrounding the ownership of the .41-acre strip based on ambiguous deeds, conflicting reports of ownership, and Mr. Hoyt's defense of advice of counsel, the court finds that Mr. Hoyt did not act knowingly or with reckless disregard as to the truth of his statements when he claimed ownership of the .41-acre strip.

201. Accordingly, the Benhams have not proven their slander of title counterclaim.

## CONCLUSION

202. In conclusion, on Count Two the court finds that Road #4 and Road #5 are not public roads by user; however, even if they were public roads, the right of public use has been lost by abandonment.

203. On Count Four, the court finds that the evidence does not establish a prescriptive easement across Road #2.

204. Finally, the court finds that Mr. Hoyt did not slander the title of the Benhams to the .41-acre strip as alleged in the Benhams' Counterclaim.

205.  Accordingly, the court finds in favor of the defendants on Count Two and Count

      Four, and finds in favor of the plaintiff on the Counterclaim.


**SO ORDERED** this 31st day of May 2011.


_____
RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana


Electronic copies to:

Debra Sue Andry
DEBRA S. ANDRY, ATTORNEY AT LAW, LLC
debra.andry@gmail.com

Daniel L. Brown
ALLEN, ALLEN & ALLEN
danielbrown@allenlawyers.com

Mick G. Harrison
mickharrisonesq@earthlink.net

Jill Z. Julian
UNITED STATES ATTORNEY'S OFFICE
jill.julian@usdoj.gov

Rudolph William Savich
rsavich@aol.com

Copies to:

ALAN TRENT FESSELL
c/o Herman N. Fessell
1015 Bloom Hill Avenue
Valrico, FL 33596-7177

HERMAN NICHOLAS FESSELL
1015 Bloom Hill Avenue
Valrico, FL 33596-7177

DENNIS ERIC FESSELL
c/o Herman N. Fessell
1015 Bloom Hill Avenue
Valrico, FL 33596-7177

LINDA D. FESSELL
c/o Herman N. Fessell
1015 Bloom Hill Avenue
Valrico, FL 33596-7177